DE CHAMBRUN v. COX et al.

(Circuit Court of Appeals, Second Circuit. February 27, 1894.)

No. 64.

1. CONTRACTS—CONSTRUCTION—PRIORITIES.

One C. undertook to promote and carry on litigation to recover real estate belonging to certain heirs, who agreed to give him a percentage of the amount recovered "for fees, and also to repay him for advances, disbursements, and whatever expenses" he might incur to effect the recovery. C. agreed with one of his counsel to pay him, in addition to professional compensation, $25,000 out of the proceeds recovered, "after the payment of all proper disbursements." By numerous subsequent contracts he assigned specified proportions of his share of the amount to be recovered to various persons in consideration of professional services and advances of money to carry on the necessary litigation. *Held,* that the amounts so assigned are entitled to priority of payment over the $25,000, though the contract on which that is based was prior in point of time.

2. TRUSTS—TRUSTEE DEALING WITH FUND—ACCOUNTING.

S. held two of these contracts by which the amount to be paid was made a lien on C.'s share of the recovery. She assigned these contracts to one of C.'s attorneys under an agreement that she was to be paid what was due under the subsequent contract before the attorney received

anything under the prior one, and he at once executed a declaration of trust in C.'s favor as to the claims assigned to him, subject only to his lien for fees in the main litigation. The attorney then induced S. to accept a smaller sum than was due under her subsequent contract, and to agree to his retaining the balance as compensation for his services in prosecuting the claim; and the amount he actually received from the proceeds of the assigned contracts, pursuant to this arrangement, exceeded the fees for which he had a lien. *Held* that, as to the excess, this was an unlawful dealing with the trust fund for his own benefit, and he must account to C. therefor.

**8. SAME—HOSTILE CLAIMS.**

Other contracts which created liens on C.'s share of the recovery were assigned to the same attorney, and were included by him in the same declaration of trust in C.'s favor. His relation as attorney was terminated, and he agreed with the holders of contracts prior to those assigned to him to prosecute their claims in consideration of a portion of the amount to be recovered thereunder. *Held,* that these claims were hostile to the trust fund, and hence he could not deal with them for his own benefit, but must account to C. for the profit thence arising.

Appeal from the Circuit Court of the United States for the Northern District of New York.

This was a bill for an accounting originally filed by Charles A. De Chambrun against Douglas Campbell, impleaded with Frances A. Gesner. The deaths of De Chambrun and Campbell being suggested, Pierre De Chambrun, as administrator of the former, and Abraham Cox and William A. Campbell, as executors of the latter, were substituted. There was a decree for defendants, and complainant appeals.

Everett P. Wheeler and Wyllys Hodges, for appellant.

Louis Marshall, for appellees.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Charles De Chambrun was a lawyer having an office at Washington, D. C., and in some way connected with the French legation. Having become satisfied that certain real estate in the city of New York, then in the possession of Nelson Chase and others, was in law the property of the heirs of one Stephen Jumel, he undertook to promote an action to secure its recovery. With the assistance of one Stanislaus Le Bourgeois he succeeded in discovering the Jumel heirs, resident in France, and on April 20, 1876, entered into an agreement with them, by the terms of which he undertook and agreed to commence and carry on proceedings for the recovery of the estate of the said heirs, and to bear the expenses thereof. The heirs agreed to pay him as compensation for his services and outlay a sum equal to $47\frac{1}{2}$ per cent. of any money or property recovered in such proceedings, and as security for such payment gave him a lien upon such recovery. They also executed a power of attorney, giving him full authority to act for them, retain counsel, prosecute suits, negotiate, and compromise, but at his own risk and expense. In furtherance of the end proposed, De Chambrun retained various attorneys and counsel, and incurred considerable expense in and about the prosecution of the proceedings, with the result that eventually there was recovered for the

heirs property which turned out to be worth nearly $350,000. The 47½ per cent. to which De Chambrun was entitled, less commissions of the trustee appointed by the state court to sell and distribute, amounted at the time of final distribution to $178,784.33. The litigation was long, arduous, complicated, and expensive. De Chambrun either was not able, or, if able, did not choose, to pay all the counsel fees or other disbursements as they were incurred. He did, indeed, at various times pay out as counsel fees to lawyers engaged in the proceedings some $7,000 to $8,000, and his entire cash disbursements amounted to nearly $34,000. This sum seems, however, to have been entirely inadequate to conduct the controversy, and, in order to provide means to pay counsel and meet the other disbursements, De Chambrun entered into agreements, in some instances with counsel, in others with lenders of money, stipulating for payment out of his share of the proceeds of the litigation. These agreements were executed by De Chambrun with such reckless improvidence that the aggregate thereby promised considerably exceeded the entire amount of his 47½ per cent. Some of the counsel, however, who were thus retained died before rendering the services stipulated, and in the subsequent proceedings (referred to below as the Chase suit) several of these contracts were for that or other reasons disallowed. It will be sufficient, therefore, to refer only to the following:

(1) Contract No. 1. On March 3, 1876, De Chambrun entered into an agreement with E. Delafield Smith, a lawyer, practicing in New York city, whereby, in consideration of $16,250, advanced by the latter, for the purpose of negotiating and perfecting the purchase from the French heirs, De Chambrun assigned to him one-fourth of his interest in any contracts he should have or thereafter make with the French heirs. This agreement was superseded by subsequent agreement of the parties to it on January 5, 1877.

(2) Contract No. 2. On March 3, 1876, De Chambrun and Smith entered into another agreement. It recited the purchase by the latter of a one-fourth interest in De Chambrun's contracts with the French heirs, and that Nelson Chase, a tenant upon and claimant of part of said Jumel estate, was indebted to Smith to the amount of about $25,000. Thereupon the parties further agreed that "the said sum of $25,000, or thereabouts, shall also be paid to the said Smith out of the proceeds of said Jumel estate so acquired by the said heirs, or any further interest therein, after the payment of all proper disbursements, and is hereby made a charge on the same." The agreement also made special provision as to a portion of the Jumel lots owned by Smith's partners, which is immaterial to the present discussion. The superseding agreement of January 5, 1877, above referred to, expressly referred to this contract No. 2, and continued it in force.

(3) Contract No. 3. On July 10, 1876, De Chambrun executed an instrument in writing, by which he transferred to Stanislaus Le Bourgeois 7½ per cent. out of his 47½ per cent., "in consideration of the services you [Le B.] have rendered in discovering heirs of Stephen Jumel, who were unknown to me [De C.], and in settling

with them, in advance, and in my absence, and in my name, the basis of the contract of April 20th, 1876."

(4) Contract No. 4. On August 8, 1876, De Chambrun agreed with John A. Stoutenburgh, a lawyer in New York city, to pay or cause to be paid to him the sum of 4 per cent. on the entire proceeds of the property recovered, covenanting that "under and by virtue of the power invested in De Chambrun by the heirs" it be created and made a specific lien on the property, and every part thereof, to be paid as fast as proceeds be recovered. The consideration is stated as consultations had and services already rendered by Stoutenburgh, and professional services further to be rendered.

(5) Contract No. 5. On October 4, 1876, De Chambrun made a further agreement with Levi S. Chatfield, also a lawyer in New York, agreeing to pay him $1,000 within a few days, and further to pay him, his heirs or assigns, $45,000, when the title to the property should be established; and, if less than the whole should be recovered, or the right of the heirs compromised for less than the whole amount, then to pay a pro rata share of the amount recovered; no part of the $45,000 to be paid in the event of an entire failure to recover. To these payments De Chambrun pledged his share and interest under the French contract. The consideration expressed is "for services performed and to be performed, and information communicated in relation to the interests of the legal heirs," etc. In the subsequent proceedings (referred to below as the Chester suit) it was held that Chatfield did perform such services, and did communicate such information, and no one upon this appeal questions that finding.

(6) Contract No. 6. On October 25, 1876, De Chambrun agreed in writing with George J. Schermerhorn, also a lawyer, who had been employed by De Chambrun a few months before, to pay him $500 within 90 days, and $10,000 when the title of the heirs shall be established either by suit or compromise, to the property, or any part thereof. To secure this payment De Chambrun mortgaged his interest under the French contract. The consideration is "for services performed and to be performed during the next ninety days." The agreement is headed with the title of the first suit brought by the heirs against Nelson Chase, which had been begun in September, 1876, with E. Delafield Smith as solicitor and Stoutenburgh as counsel.

(7) Contract No. 7. On October 29, 1876, De Chambrun entered into an agreement with W. N. Griswold and Henry Chamberlain. After reciting the contract with the French heirs, it sets out the fact that it has become necessary to raise more money for the prosecution of the claim, and to defray the expenses thereof. By its terms, Griswold, who was a real-estate expert, and Chamberlain, undertook to advance $6,600 for that purpose, and De Chambrun assigned to them 5 per cent. out of his $47\frac{1}{2}$ per cent.

(8) Contract No. 8. On November 9, 1876, De Chambrun, by an instrument in writing, assigned to Jesse C. Connor $3\frac{1}{2}$ per cent. of 40 per cent. of the entire recovery, and made such assignment a lien on whatever might be recovered by him (De Chambrun) under his con-

tract with the Jumel heirs. The consideration was "services to be rendered by Connor in relation to the prosecution and preparation of the case of the said heirs against Nelson Chase and others."

(9) Contract No. 9. On January 5, 1877, De Chambrun and Smith entered into an agreement by which Contract No. 1, supra, was abrogated. The parties then agreed that Smith should receive out of the proceeds of the adventure his advance of $16,250, and one-tenth in value of the recovery in the Jumel proceedings. This was in consideration of the services of Smith, who was to continue to be, as he had been in the past, the "attorney and counsel of the heirs in all present and future actions, suits and proceedings." Smith died in April, 1878. In May, 1878, the suit in which he had appeared was discontinued, and in the same month a second equity suit was brought, in which Stoutenburgh appeared as solicitor.

(10) Contract No. 10. On August 28, 1880, De Chambrun and Schermerhorn entered into a further agreement, whereby, "in consideration of services rendered by Schermerhorn, at the request of De Chambrun and in behalf of the heirs * * * in the litigation," De Chambrun agreed to pay him $30,000, making the same a lien upon any money said De Chambrun might receive for said heirs.

(11) Contract No. 11. On August 31, 1881, to secure the payment of $10,000, which De Chambrun borrowed from Frances A. Gesner, he assigned to her all his right, title, and interest under the contract with the French heirs. He confirmed this with another agreement to the same effect on March 18, 1882.

(12) Contract No. 12. In 1880 defendant's testator, Douglas Campbell, also a lawyer, was employed by De Chambrun to render services in that capacity. He continued in such employment, acting as counsel in the various suits, actions, and proceedings, until June 16, 1884, when, the litigation for which he was retained being closed by a final settlement in a partition suit,—brought after compromise of the second equity suit had left the Jumels tenants in common with other claimants,—he terminated his employment by written notification to De Chambrun. On May 6, 1882, De Chambrun, by an instrument in writing, transferred out of his 47½ per cent. to Douglas Campbell the sum of $25,000, with interest from May 6, 1882, giving him a lien therefor. The consideration expressed was "professional services rendered."

The Jumel litigation being terminated, and its gross proceeds in the hands of a trustee for distribution, and there being delay in the final settlement of the claims, one Stephen M. Chester, to whom Stoutenburgh had assigned his contract (No. 4, supra), brought a suit (about January 1, 1886) against the heirs, De Chambrun, and the various claimants under the latter's assignments, to determine the validity and priorities of all such claims. De Chambrun appeared by counsel, and denied that any of the claimants had any right, share, or interest in or upon the lands or moneys in the hands of the trustee; alleged that he had expended $30,000 for expenses, and that his services were reasonably worth $30,000. By his procurement the French heirs contended that their agreement with him was void for champerty. These defenses were not sustained, and

the referee in Chester v. Jumel found in favor of most of the claims litigated. The judgment upon his findings was adopted as the rule of distribution in still another action,—Tauziade v. Jumel,—wherein final distribution was made of the fund of $178,784.33 as follows:

| | | |
|---|---|---|
| No. 3. | Le Bourgeois | $ 28,302 76 |
| No. 4. | Stoutenburgh (Chester) | 15,045 96 |
| No. 5. | Chatfield | 16,776 46 |
| No. 6. | Schermerhorn | 17,026 55 |
| No. 7. | Griswold | 9 306 06 |
| No. 8. | Connor | 2,521 36 |
| No. 9. | Smith (Margaret J., Executrix) | 37,746 96 |
| No. 10. | Schermerhorn | 51,656 26 |
| No. 11. | Gesner (the balance of the fund) | 601 36 |

$178,784 33

Other contracts sustained by the referee are not referred to in this opinion, since those above recited exhausted the fund.

Before stating the nature of the claim made by the complainant and appellant in the case at bar, it will be necessary to set forth yet another series of assignments. On February 25, 1882, Chatfield assigned his contract (No. 5) to William H. Adams, and on March 17, 1882, Adams assigned it to Campbell, the latter paying to Chatfield and his assignee, on account of the purchase price of said contract, $3,888; and to Adams, for services rendered to De Chambrun, $150. On May 6, 1882, Campbell assigned his contract (No. 12, supra) to Margaret Smith (E. Delafield Smith's executrix). On May 17, 1882, Margaret Smith assigned to Campbell, inter alia, contracts Nos. 1, 2, and 9, supra, the claim against De Chambrun for $16,250, with interest from March 11, 1876, and the claim against Nelson Chase on his promissory notes for about $25,000, upon the express condition that $25,000, with interest from May 6, 1882 (the amount of Campbell contract, No. 12, supra), should be paid in full to Mrs. Smith before payment of any sum whatever should be made to Campbell under Margaret Smith's assignment to him. These Chatfield and Smith assignments to Campbell appear to have been made with De Chambrun's assent, presumably to secure some control of the Chatfield and Smith claims, and to arrange more securely for Campbell's contingent fee, his own contract being so late in order of time that the fund would probably be exhausted before his lien thereon could be satisfied. Accordingly, on July 21, 1882, Campbell executed a declaration of trust, in which, after reciting the assignments from Smith and Chatfield (through Adams) to himself, he declared that he held "all of said contracts, agreements, and claims for the benefit of Charles A. De Chambrun, subject only to his (Campbell's) interest therein and lien thereon for legal services." Immediately thereafter De Chambrun assigned his rights under this declaration of trust to Mrs. Gesner, to further secure her claim against him. On July 1, 1884, immediately after Campbell had ceased to be counsel for De Chambrun, he entered into an agreement with Schermerhorn whereby they agreed to make common issue in the prosecution of their claims to recover compensation for their professional services

in the Jumel litigations, and to divide, share and share alike, the net sum each should obtain, whether under their own contracts or under those which either of them then held or might thereafter acquire. Some time subsequent to the declaration of trust, Campbell acquired interests in the claims of Stoutenburgh-Chester, Griswold, and Margaret Smith, by agreements with them, respectively, whereby he agreed to act as counsel for each of them in the Chester suit and subsequent litigations. With Margaret Smith he agreed, June 19, 1884, to prosecute her claim to the $25,000 and interest, under her assignment to him of May 17, 1882, holding her harmless against all costs and expenses of litigation. In the event of success he was to keep for himself all of the recovery in excess of the sum of $18,000, plus interest from December 19, 1884. Under a similar arrangement he agreed to prosecute the Stoutenburgh-Chester claim, retaining for himself all recovered in excess of $5,000. And of the Griswold claim he was to receive, under like arrangement, all in excess of $4,000. Of the Le Bourgeois claim he acquired in April, 1888, an option to purchase the same for the sum of $15,000, with interest from that date. In the answer it is averred that "he never actually became the owner thereof, the same having been purchased by Ashbel Green." He did, however, prosecute the claim. Whether anything was received by him on final recovery, and, if so, how much, does not appear. In the Chester and Tauziade suits Campbell appeared, originally or ultimately, for himself, Smith, Chatfield, Chester, Griswold, and Ashbel Green (assignee of Le Bourgeois). Other counsel appeared for De Chambrun and for the French heirs. Frances Gesner was represented by her own counsel, as was also Schermerhorn; and Connor was represented by Schermerhorn. The various contracts; numbered supra, were proved, as were also the Chase notes. In his findings of fact the referee found substantially as stated in this narration as to the making of the several above-numbered contracts, and the course of litigation to recover the property. He also found that the Chase notes amounted to $23,740, and that De Chambrun had proved disbursements made by him to the amount of $33,-445.27. He further found that Campbell's professional services in the matters in which he had been retained by De Chambrun for the heirs were in the aggregate of the value of $30,000, on account of which he had received $950 only; and that he had advanced for the benefit of De Chambrun to Chatfield and Adams $4,038. Inasmuch as part of these services were rendered subsequent to recovery,—that is to say, in the partition suit and proceedings to distribute,—52½ per cent. of those services was charged against the Jumel heirs, and $7,875 paid by them to Campbell. The remaining 47½ per cent. of those charges ($7,125), and all charges for services prior to recovery from the Chases ($15,000), besides the moneys advanced for De Chambrun ($4,028), reduced by the credit of $950, was charged against the latter, the amount being $25,213. The referee found as a conclusion of law as to the declaration of trust and subsequent assignment thereof that Campbell held the Chatfield contract, and any interest in the Smith contract which might remain after payment to Margaret Smith of the $25,000 and interest from May 6, 1882, in

trust for De Chambrun and his assignee, Gesner, but subject first to Campbell's lien thereon for the said sum of $25,213, due to him for services and disbursements.out of De Chambrun's 47½ per cent. The claims found by the referee, and the order of priority to which he held them entitled, are enumerated supra. The amounts are a little in excess of those given by him, the property having appreciated between the filing of his report and final distribution. Neither the referee's report nor any subsequent judgment in either the Chester or the Tauziade suit contained any express statement of a conclusion of law as to the status of the Smith-Chase contract, No. 2, supra.

The contention of the complainant and appellant in the suit at bar is twofold: First. That Campbell, either through gross neglect of his duty as trustee under the declaration of trust, or fraudulently and by collusion with Schermerhorn, procured the omission of the Smith-Chase claim from the referee's report, and the judgments in the actions for distribution, to the damage of the complainant's intestate. Second. That Campbell, being trustee and former counsel of De Chambrun, purchased interests in several of the claims of others against the fund,—claims which conflicted as to priority with those which he held as trustee,—and by such purchase realized large profits, for which profits, it is contended, he should account to his cestui que trust.

1. The first of these only is considered in the opinion of the circuit court. In the view we take of this part of the case, it will not be necessary to discuss the facts in proof on which the complainant relies to establish the fraud he alleges. Long before the Chester case was submitted to the referee, there existed bitter hostility between De Chambrun and Campbell. Who was in fault for this falling out it is not necessary to inquire; nor need we review the voluminous correspondence which has been put in evidence, nor follow step by step the various proceedings in court and before the referee, which it is claimed indicate an intent collusively to postpone the Smith-Chase claim, or to subordinate it to others; nor need we review the calculations, which complainant insists show that there was a motive for securing its rejection, because, had it been allowed with priority according to its date, it would have so depleted the fund that there would have been practically nothing left to pay the $51,656.26, under contract No. 10 (Schermerhorn, supra), in which Campbell had acquired a half interest. The fundamental difficulty with complainant's contention is that, although (except for the superseded contract No. 1) the Smith-Chase contract was the first in order of time, it was not entitled to priority according to its date. All the other contracts provided for compensation to be made for professional or other services rendered or disbursements made or information given. This one was evidently intended to secure a claim of Smith, not against De Chambrun, but against Nelson Chase, in the event of the latter being deprived of the means to pay his debts by reason of the success of the very litigation Smith was about to conduct, and for his services in which Smith had already secured, by contract No. 1 (not then superseded), one-fourth

part of De Chambrun's share. If it were necessary, in order to secure success, to disburse still more, there was reason why the parties should agree that the costs of victory should first be paid, and the loss that victory might entail on Smith be compensated for, only out of the residue. The phraseology of the various contracts indicates just such an intent. All of the others assign some percentage of the proceeds, or make some specified sum a lien or mortgage upon the proceeds of recovery, without any suggestion as to priority other than such as their respective dates imply. In the Smith-Chase contract, however, it is expressly provided that the amount of the notes shall be paid to Smith, out of the proceeds of the Jumel estate "so acquired by the said heirs," "*after the payment of all proper disbursements.*" When it is borne in mind that at the time this contract was entered into the disbursements already made were comparatively small; that suit had not yet been begun; that the litigation about to be undertaken would necessarily be long, difficult, and arduous, requiring not only the professional services of able counsel, but also careful and intricate examinations of real estate records and of pedigree, would necessitate much documentary proof, the taking of testimony in a foreign country, one, or perhaps more, trials in court, and possibly appeals, involving great expense,—we cannot assent to the proposition that the quotation above italicized was intended only to provide for disbursements already incurred. All proper disbursements from the beginning of the campaign till its close were undoubtedly included in the phrase. Nor, in our opinion, is the word "disbursements" used therein with the narrow and technical meaning it has acquired in the offices of court clerks, as something distinct from "costs," "counsel fees," and "allowances." The contract of De Chambrun with the French heirs sets forth that his share of 47½ per cent. is "attributed to him  *  *  *  as much for his having made known to them the existence of that estate as for fees, and also to repay him for advances, disbursements, and whatever expenses he may have made and shall make to bring about the recovery." It was the payment of moneys properly disbursed by De Chambrun to bring about the recovery to which the payment of the Chase notes was postponed. First of such disbursements are the fees of attorneys and counsel. It surely could not be reasonably contended that, had De Chambrun paid in cash all retainers and charges of counsel as they accrued, he would not be entitled to reimbursement therefor out of the proceeds, before being called on to respond for Chase's default on his notes. The situation is not changed, because, not having the means to pay, he postponed their settlement until the end of the litigation; nor because most of the attorneys and counsel bargained for fees contingent on success, and no doubt largely increased in amount because of such contingency. The law of this state allows attorneys and counsel thus to buy interests in the claims they professionally represent, and Smith and De Chambrun, both lawyers, had that very day made just such a contract. The bulk of the claims allowed by the referee were of this character. That of Griswold and Chamberlain (No. 7) was for moneys which it had become necessary to raise for the prosecu-

tion of the Jumel claim, and to defray the expenses thereof. That of Le Bourgeois was for services rendered in discovering the French heirs and negotiating the contract with them. To trace out the pedigree and establish the identity of the persons in whose name the suit was to be brought was necessarily the first thing to be done, and the expense of so doing was a disbursement which De Chambrun would have to make before he could even begin to bring about the recovery. Moreover, the referee found that De Chambrun had disbursed in cash $33,445.27. He disallowed, indeed, De Chambrun's request that the same should be paid before any of the claims of the defendants, as he found them. But, as between De Chambrun's claim for cash disbursements and the Smith-Chase claim (which was not included at all among the conclusions of law), the terms of the latter so plainly postpone it to the former that we must assume that, had any such question of priority been considered by the referee, he would have so held. Whatever, then, Campbell may have done or omitted to do touching the Smith-Chase claim, can in no way have injured complainant's testator, who was not entitled to have it paid in advance of the claims which were allowed, whose allowance is not disputed here, and which wholly exhausted the fund.

2. The other branch of the complainant's claim remains to be considered. The finding of the referee in the Chester suit as to the declaration of trust has already been stated, and is undoubtedly correct. By its terms Campbell was constituted trustee to hold the Smith and Chatfield contracts for the benefit of De Chambrun, subject only to his own interest therein and lien thereon for legal services. That lien also covered the moneys he advanced for the benefit of De Chambrun to pay Chatfield and Adams for their assignments. The terms of the Smith assignment, moreover, required him to pay Margaret Smith $25,000 and interest from May 6, 1882. Out of the residue and the proceeds of the Chatfield contract he was entitled to retain the amount of his own lien, and the balance he was bound to hold for De Chambrun, or his proper assignee. At the time Campbell accepted this trusteeship and undertook its obligations, he was, and had for a long time been, De Chambrun's counsel. It is urged by defendant that the relation of attorney and client never existed between them, inasmuch as Campbell was retained for the Jumel heirs, as the associate of De Chambrun. In one sense this is true, but De Chambrun was the attorney in fact for the heirs. He selected and retained counsel; he alone directed the conduct of the proceedings; he alone, out of his percentage, was to pay such counsel as he did retain. The relation between the two men was that one of trust and confidence which the law assumes to exist between client and counsel. By reason of his professional connection with the litigations as to the Jumel estate, and his relations with De Chambrun himself, Campbell undoubtedly acquired a fund of information touching not only the suits to recover possession of the estate, but also the complicated, conflicting, and improvident contracts which De Chambrun's recklessness had attached to the fund out of which alone compensation could ultimately

come. When, with De Chambrun's consent, he accepted the trust, he accepted it charged with all the knowledge he had thus acquired. When, two years subsequently, he terminated professional relations with De Chambrun, he did not thereby relieve himself from the obligations of his trusteeship under the written declaration of trust, nor did he become free to use, for his own benefit, and against the interests of his cestui que trust, the information he had obtained while the confidential professional relations existed between them. It is not only as a trustee, but as a trustee who is a lawyer, and has been himself practically counsel for his cestui que trust in the very matters out of which the trust springs, that Campbell's conduct is to be judged. But it needs even no such addition to the wholesome rule of equity, too elementary to require citations, that a trustee may not so manage the trust estate that thereby he shall benefit at the expense of his cestui que trust. Had he been some chance comer, appointed trustee without any knowledge whatever of the subject-matter, his conduct touching the Margaret Smith claim (to $25,000 and interest under the assignment of May 17, 1882) would have been equally indefensible. It will be remembered that, under cover of the agreement to prosecute her claim before the referee,—the very claim which he held in trust,—he induced her to agree to accept, instead of $25,000 and interest from May 2, 1882, $18,000 and interest from December 16, 1884. In urging her to make such reduction he referred to the fact that the fund to be ultimately realized would be inadequate, and that De Chambrun, to whose "indomitable energy and pluck" it was due that the work of recovery was carried on, was likely to be left, not only without repayment of his expenses, but heavily in debt,—a result which, he expressed the hope, "none of the interested parties would be willing to see," and added that he himself would willingly make a liberal reduction from his own fee, rather than that De Chambrun should thus lose all for which "he had worked well and long." So far as he was a trustee for her under her assignment to him, this arrangement with Mrs. Smith to reduce her claim was right enough. She could remit as much of it as she chose. Such remission only left a larger balance for the other persons interested in the trust. Had he arranged for such a reduction of her claim, that the balance of it, together with the Chatfield claim, amounted to just the amount of his own fees, De Chambrun could not complain. He was entitled only to the residue after Margaret Smith and Campbell had both been paid. And Campbell could not be expected to obtain from Mrs. Smith any greater reduction than she was willing to give. But Campbell did secure such a reduction that the balance of the Smith claim under contract No. 9 (after paying Mrs. Smith), plus Chatfield's, amounted to considerably more than his fees. Had this been done as part of the administration of his trust, De Chambrun would have benefited thereby to the extent of the difference; but Campbell so arranged the transaction as to put the difference into his own pocket. That he covered up the transaction by an agreement to take the amount of the reduction as his fee for collecting the Smith claim will not avail. The court will look through the

form to the substance. The amount of the reduction was $13,-815.06 out of a claim of $37,746.96, a sum grossly disproportioned to any possible quantum meruit for prosecuting the Smith claim in the Chester and Tauziade suits. It is true, as stated before, that the law of this state allows members of the bar to make such agreements for contingent compensation,—in our opinion, most unfortunately for the profession, as the record of the case at bar abundantly shows,—but, so far as we know, it has not changed the rule as to a trustee's duty so as to allow him, by such an arrangement, practically to buy at a discount claims which conflict with his trust estate and himself reap the fruits of his speculation.

The following statements show the result of Campbell's agreement with Margaret Smith:

| | |
|---|---:|
| Chatfield claim................ ............................... | $16,776 46 |
| Smith claim............................................... | 37,746 96 |
| | 54,523 42 |
| Under original arrangement Margaret Smith was entitled to $25,000 and interest from May 6, 1882, say, in round numbers, altogether .......................................... | 32,500 00 |
| Balance to be distributed under declaration of trust.......... | $22,023 42 |

—And which is insufficient to satisfy Campbell's lien for fees.

| | |
|---|---:|
| Smith and Chatfield, as before............................... | $54,523 42 |
| Mrs. Smith received in full satisfaction...................... | 23,931 90 |
| Balance to be distributed.................................... | 30,591 52 |
| Campbell's lien for fees, etc................................ | 25,213 00 |
| Balance which, under trust, would have come to De Chambrun.. | $ 5,378 52 |

—But which, under Campbell's arrangement with Margaret Smith, he retained for himself.

The other claims in which Campbell acquired interests under cover of an arrangement for counsel fees, viz. Chester-Stoutenburgh and Griswold, were undoubtedly claims hostile to those which he held under the declaration of trust, since the fund was inadequate to pay all. His plain duty as a trustee forbade him from speculating in hostile claims to his own profit. If he wished to be free from the obligation of his trusteeship, he should have notified his cestui que trust, and secured the appointment of another trustee. Equity will not tolerate his continued holding of the one set of claims as a trustee and dealing with hostile claims as an individual. Whatever profit a trustee makes by such operations, he must account for to his cestui que trust. The cases cited by counsel for the appellee do not apply. They hold that under some circumstances an attorney whose relation with his client has been severed, not on the ground of his own misconduct, may act for an opposite party when it clearly and distinctly appears that he does not avail of information obtained in his former character to the prejudice of his former client. Were the question here one solely of professional relation, we might analyze these authorities and compare them with others,—profitably, no doubt; for any relaxation of the wholesome

rule as to disqualification by reason of professional relations should be most scrupulously and carefully limited and defined before it is announced by a court of equity. But in this case we are spared all such discussion. It is not a question of professional relations, but of the obligations of a trustee of an express trust. Under the declaration, Campbell held, inter alia, the Smith-Chase contract for others as well as himself. In point of time it was prior to all the others, but by its terms was to be postponed to such subsequent ones as represented proper disbursements of De Chambrun, and were so phrased as to be valid obligations against the fund. At least one claim, apparently for counsel fees, was rejected by the referee because the phraseology of the contract on which it was based permitted recovery only when the title of the heirs was established to the property,—an event which he held never happened, since the original controversy was compromised. Whether or not the terms of all the other contracts permitted recovery, and whether they covered proper disbursements, were issues upon which the legal owners of those other contracts and the legal owner of the Smith-Chase were irreconcilably hostile. To sanction the contention that the holder of the Smith-Chase contract, when that holder is a trustee, active or passive, could acquire or hold any part or lot in hostile claims, or even prosecute them to his own personal profit, would be subversive of the fundamental principles of equity. The same remarks apply to the claims represented by Schermerhorn, in which concededly Campbell acquired a half interest, and would apply to the Le Bourgeois claim, if in fact he realized anything out of it, which the record before us leaves in some doubt.

The judgments in the Chester and Tauziade suits are no bar to the second claim in this suit, which was not, and could not be, litigated therein; nor was De Chambrun under any obligation to object in those suits to Campbell's prosecution of the hostile claims on the ground that he was the trustee of other claims. Whatever pecuniary benefit the trustee thereby obtained would be for the benefit of his trust, and the cestui que trust might fairly lie by, allow the trustee to secure all he could, and rely upon the subsequent accounting for the protection of his own interest. The decree of the circuit court is reversed, with costs, and the cause remitted to that court, with instructions to decree in favor of the complainant for an accounting as to any profits made by defendant's testator in excess of his fees and disbursements ($25,213) out of the claims of Stoutenburgh-Chester, Griswold, Chatfield, Smith, and Schermerhorn.

On motion to amend the mandate the claim of Stanislaus Le Bourgeois was included among those for whom the accounting for profits was ordered.